## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERBERT SILVERBERG, Derivatively on Behalf of Nominal Defendant EASTMAN KODAK COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> JAMES V. CONTINENZA and GEORGE KARFUNKEL, <br><br> Defendants, <br><br> and <br><br> EASTMAN KODAK COMPANY, <br><br> Nominal Defendant. | Case No.: 6:21-cv-6567 <br><br> **VERIFIED SHAREHOLDER** <br> **DERIVATIVE COMPLAINT** |

Plaintiff Herbert Silverberg ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Eastman Kodak Company ("Kodak" or the "Company"), seeking to remedy violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, and violations of Kodak's Insider Trading Policy (defined below). Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and otherwise upon information and belief developed from the investigation and analysis by Plaintiff's counsel of public records, including but not limited to: (a) a review of filings by or relating to Kodak made with the U.S. Securities and Exchange Commission (the "SEC"); (b) a September 15, 2020, Report (the "Report") to the Special Committee (the "Special Committee") of the Board of Directors the ("Board") of Kodak regarding the events surrounding the U.S. International Development Finance Corporation's ("DFC") Letter of Interest ("LOI") Announcement; (c) press releases, news reports, analyst reports, earnings call transcripts; and (d) public filings in lawsuits including the Affirmation of Jeffrey A. Novack (the "Novack

Affirmation" or the "Novack Aff.") made by New York State's Attorney General ("NY AG") and informed by the State's subpoena power in *In the Matter of the Inquiry by Letitia James, Attorney General of the State of New York v. Eastman Kodak Co. and Continenza*, Index No. 451652/2021 (Supreme Court, N.Y. Cty.) (the "New York State Inquiry").

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Defendants initially breached their fiduciary duties and violated the federal securities laws by failing to disclose the existence of a secret understanding (the "Secret Understanding") previously reached with James V. Continenza ("Continenza"), the Company's Executive Chairman and Chief Executive Officer ("CEO"), to shield Continenza's equity interest in Kodak from the dilution other shareholders experienced as a result of a prior capital raise in an April 9, 2020, proxy statement (the "2020 Proxy") seeking shareholder approval, at a May 20, 2020 annual meeting, of an executive compensation plan.  On July 27, 2020, Continenza received options to purchase 1.75 million shares of Kodak stock pursuant to the Secret Understanding at the then-trading price of the Company's stock, which price failed to reflect material non-public information that Kodak, a struggling company, might be handed a financial lifeline through a major governmental loan program relating to securing the domestic production of chemicals necessary to manufacture pharmaceuticals and that the federal government planned to purchase for a strategic stockpile while also helping Kodak facilitate advance purchase orders from drug companies.

2.      Continenza also breached his fiduciary duties to the Company, on June 23, 2020, by purchasing Kodak stock in violation of the Company's Insider Trading Policy while Kodak was negotiating a non-binding LOI with the DFC for a federal grant or loan, exceeding the Company's market capitalization and enabling Kodak to launch a pharmaceutical subsidiary.

3.      On July 28, 2020, when Kodak disclosed the LOI, Defendant George Karfunkel ("Karfunkel") breached his fiduciary duties by disposing of over one hundred million dollars' worth of Kodak stock at an inflated price based upon his superior knowledge of the more limited benefit of the DFC loan program than that which was perceived to be the case by public investors and in violation of the Insider Trading Policy.  Karfunkel's disposition supposedly took the form of a *bona fide* gift but bears no resemblance to the same because it was partially rescinded approximately months after the purported bequest.

4.      Aside from the substantial benefits derived by Defendants from their faithless conduct, Kodak has been materially damaged by the swift and widespread negative reaction to Defendants' self-dealing.  Specifically, Kodak has failed to finalize the LOI and currently assumes the DFC Loan will not proceed.  At the same time, Kodak is exposed to the costs of defense and liability with respect to the New York State Inquiry and *In re Eastman Kodak Company Securities Litigation*, No. 6:21-cv-06418 (W.D.N.Y.) (the "Securities Class Action").

5.      On August 24, 2020, Plaintiff made a litigation demand (the "Demand") on the Board to assert the claims alleged in this action, as required by New Jersey law, under which Kodak is incorporated, before a shareholder may assert derivative claims.

6.      The Board failed to respond to the Demand substantively or in a timely manner, giving Plaintiff the right to bring this action.  Alternatively, to the extent the Report constituted a refusal of the Demand despite having issued before the Demand was made, that refusal was not made in good faith or with a reasonable basis.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this Complaint arises under federal securities laws.  This Court has supplemental jurisdiction over

the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This is not a collusive action to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Kodak is headquartered in this District, a substantial portion of the wrongs complained of herein occurred in this District, Defendants engaged in activities that had an effect in this District, and this case is related to the Securities Class Action.

## III.   PARTIES AND RELEVANT NON-PARTIES

### A.   Plaintiff

9.      Plaintiff is and at all times relevant to this action has been, a shareholder of Kodak.

### B.   Nominal Defendant

10.     Nominal Defendant Kodak is incorporated under the laws of New Jersey and maintains its principal executive offices at 343 State Street, Rochester, New York 14650.  Kodak's common stock trades on the New York Stock Exchange under the ticker symbol "KODK."

### C.   Defendants

11.     Defendant Continenza served as the Board's Executive Chairman at all times relevant to this Complaint and as Kodak's CEO since July 27, 2020.  Continenza is a defendant in the Securities Class Action and is a primary subject of the NY AG's investigation.

12.     Defendant Karfunkel served on the Board at all times relevant to this Complaint.

### D.   Relevant Non-Parties

13.     Southeastern Asset Management, Inc. ("Southeastern"), which is headquartered and incorporated in Tennessee, is a large Kodak investor that nominated two members of the Board pursuant to a Purchase Agreement, dated as of November 7, 2016.

14.     Roger W. Byrd ("Byrd") served as Kodak's Corporate Secretary and General Counsel at all times relevant to this Complaint.

15. David Bullwinkle ("Bullwinkle") served as Kodak's Chief Financial Officer ("CFO") at all times relevant to this Complaint and is a defendant in the Securities Class Action.

16. Congregation Chemdas Yisroel Inc. is a charity, with respect to which Defendant Karfunkel serves as President, which received the Donation (defined below) from Karfunkel.

## IV.    SUBSTANTIVE ALLGATIONS

### A.    Company Overview

17. Kodak was founded by George Eastman in 1880 and incorporated under the laws of the State of New Jersey in 1901.

18. In early 2012, Kodak filed for Chapter 11 restructuring.

19. Since emerging from bankruptcy in 2013, Kodak has pivoted its business strategy several times seeking to establish profitability. On October 20, 2016, Kodak announced the Ektra smart phone and a tablet, an attempt to enter the mobile computing industry. In 2018, having abandoned the Ektra smart phone pivot, Kodak introduced KodakCoin, a digital currency, causing its stock price to spike from $3.10 on January 8, 2018, to $10.70 on January 10, 2018. By mid-August 2018, after that pivot was abandoned, Kodak stock was back below $3.00.

20. On or about February 20, 2019, Continenza, who was Chairman of the Board, became Kodak's Executive Chairman. Continenza's employment agreement and an "Award Agreement" of the same day under the Eastman Kodak Company 2013 Omnibus Incentive Plan (as amended from time to time, the "Incentive Plan"), were disclosed on April 1, 2019.

21. In early 2019, Kodak's market capitalization was approximately $100 million and its continued viability was in doubt. Kodak's April 1, 2019, Form 10-K, disclosed that its liquidity, capital resources, and negative cash flow were the basis of a going concern qualification from its auditors. A similar going concern qualification has been included in each of Kodak's subsequent annual reports.

22.     The Company maintains a policy titled "Limitations on Trading in Kodak Securities" (the "Insider Trading Policy"), pursuant to which employees with "ongoing access to material non-public information" may trade Kodak stock.   The Insider Trading Policy lists "common examples" of "material nonpublic information" that prohibits those in possession of such information form trading Kodak stock, including "[s]ignificant new product developments" and "[n]ew major contracts, orders, suppliers, customers or finance sources."

**B.      Kodak Accepts Dilutive Financing and Reaches the Secret Understanding**

23.     On May 21, 2019, Kodak and Southeastern entered into a Notes Purchase Agreement (the "Purchase Agreement") for $100 million of Secured Convertible Notes due in 2021 (the "Notes").   The Notes were convertible into Kodak stock at a price of $3.17482 per share and, upon conversion, would represent 42.28% of Kodak's outstanding shares.

24.     In connection with the Purchase Agreement, Continenza and the Board reached the Secret Understanding, designed to protect Continenza from the economic dilution attributable to issuing Kodak common stock pursuant to the terms of the Notes.

**C.      Kodak Seeks to Pivot into Pharmaceuticals as the COVID-19 Pandemic Spreads**

25.     On or about January 20, 2020, the first American case of COVID-19 was reported.

26.     On January 31, 2020, Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States.

27.     On March 7, 2020, former Governor Cuomo declared a disaster emergency for the State of New York because of COVID-19.

28.     Later in March 2020, Kodak engaged in initiatives to produce materials in short supply due to the COVID-19 pandemic, including isopropyl alcohol, hand sanitizer, and materials for face shields and ventilators.   Report at 12.

29.     Seeing a related opportunity to produce Key Starting Materials ("KSMs"), which are intermediaries that can be used to manufacture Active Pharmaceutical Ingredients ("APIs") for medicines, Kodak began contacting federal agencies.  *Id.*

30.     In early April 2020, Continenza connected with White House Office of Trade and Manufacturing Policy ("OMTP") director Peter Navarro ("Navarro").  On April 2, 2020, Kodak executives participated in an initial call with OMTP that extended into a months-long conversation during which Kodak pitched leveraging its expertise in chemical manufacturing and its underutilized 1,200-acre Eastman Business Park to assist with domesticating the supply chain for essential medicines.  *Id.* at 15.

**D.     Kodak Solicits Shareholder Approval of Continenza's Compensation and Amending the Incentive Plan Without Disclosing the Secret Understanding**

31.     On April 9, 2020, Kodak filed the 2020 Proxy with respect to a May 20, 2020, annual meeting of Shareholders.

32.     The 2020 Proxy's second proposal ("Proposal 2"), an advisory vote to approve of Kodak's named executive officers' compensation, described Continenza's entitlement under his employment agreement, including to four tranches of stock options representing 1.75 million shares of Kodak stock at exercise prices of $3.03, $4.53, $6.03, and $12.00, and explains that the Purchase Agreement accelerated the vesting of all of Continenza's options.

33.     The 2020 Proxy's fourth proposal ("Proposal 4") sought to add approximately 2.2 million shares to the Incentive Plan.  A footnote to a New Plan Benefits table in connection with that proposal disclosed that Kodak would make a grant of 200,000 stock options to a non-executive employee if Proposal 4 was approved.

34.     Proposal 4 was necessary because "there were not enough shares available in the Executive Compensation Plan" to satisfy the Secret Understanding.  *See* Report at 42.

35.     There was no mention of the Secret Understanding, or any other planned grants, in the 2020 Proxy.

36.     On May 20, 2020, Kodak's shareholders, without knowing of the Secret Understanding, approved 2020 Proxy Proposals 2 and 4.

### E.     As Kodak Attempts to Pivot into Pharmaceuticals, Continenza Trades on Material Non-Public Information and Violates the Insider Trading Policy

37.     On May 14, 2020, President Trump issued an Executive Order authorizing loans supporting "domestic production of strategic resources needed to respond to the COVID-19 outbreak, or to strengthen any relevant domestic supply chains."  Report at 15.

38.     On May 15, 2020, Byrd emailed the Board and select insiders, that:

This message is to advise you that the securities trading window under Kodak's [Insider Trading Policy] has opened effective today and will remain open until the close of business on Tuesday, June 23, 2020....

….

As a reminder, the Policy requires that you receive clearance from me before you engage in any transaction involving Kodak securities, even during an open window period.  (*Id.* at 34-35).

39.     Throughout May 2020, Kodak employees worked "around the clock" to provide information requested by OMTP and to prepare funding proposals.  Novack Aff. ¶16.

40.     Although the Board met during the weekend of May 23-25, 2020, the Secret Understanding could not be effectuated then because "Byrd had [] not yet calculated the numbers regarding the 'true up' grant."  Report at 69 & n.540.

41.     On May 28, 2020, when Kodak's market capitalization was approximately $110 million, the Company proposed it receive a federal grant of $435-575 million to establish a U.S. Advanced API Manufacturing Center.  Report at 17.

42.    On June 9, 2020, Kodak's Chief Technical Officer emailed an update on Kodak's work with respect to a potential governmental grant, reporting that "[it] is going well. Last week, Kodak team delivered a detailed, 50-page plan for the R&D / manufacturing platform required to build a US based pharma mfg base.  Working on business plans/ market data/ funding options. Lots to do here." Novack Aff. ¶19.

43.    On June 11, 2020, a Kodak senior executive directed an employee to "create a new project clearance list for Project Tiger[,]" including Continenza, Byrd, and three dozen other employees, in which she described the project as "highly confidential[.]" *Id.* ¶20.

44.    On June 15, 2020, a colleague asked Bullwinkle whether he was "optimistic?" about a governmental loan, to which Bullwinkle responded, "Optimistic yes!" *Id.* ¶25.

45.    In a June 17, 2020, text chain with his administrative assistant, Continenza wrote that his "calls all night with the White House" were "[v]ery [good]" and Kodak was "[s]till in it" with respect to a governmental loan.  *Id.* ¶27.

46.    A June 18, 2020, form of memorandum reserved for particularly significant or valuable internal projects warned Project Tiger members that:

> It is illegal to trade in the securities of a publicly traded company while you are in possession of material information regarding Kodak that is not generally available to the public.... The information you receive in the course of Kodak's consideration of the Project may from time to time constitute such material non-public information.  If you decide to trade in Kodak securities while the project is on-going, you must pre-clear any transaction with [Byrd.] (*Id.* ¶29.)

47.    June 22, 2020, was the last day for any Kodak employee seeking to trade within the "Window Period" that opened on May 15, 2020, to contact Byrd "via email" pursuant to a "Clearance Procedure" detailed in the Insider Trading Policy because, as Kodak's Insider Trading Policy explains, requests for pre-clearance are not self-executing, but, instead, "[u]pon receipt of [an] email, [a] proposed transaction will be reviewed and [a proposed seller] will receive a response

whether or not the transaction is permissible." *Id.* ¶32.  Continenza did not request permission to trade Kodak securities by email on or before that day.  *Id.* ¶35.

48.     On the morning of June 23, 2020, Byrd emailed Continenza and others that it was the last day of the Window Period.  Byrd also texted Continenza Kodak's stock price and a reminder that the Window Period was closing.  *Id.* ¶33.

49.     During the afternoon of June 23, 2020, Continenza purchased 46,737 shares of Kodak stock at an average price of $2.22.  *Id.* ¶34.  Since that time, Continenza has not reported purchasing any additional shares of Kodak common stock.

**F.      Kodak Secures the LOI**

50.     On July 9, 2020, a DFC representative raised the concept of a draft term sheet to Continenza.  Report at 22.

51.     Between July 9 and 20, 2020, Kodak fielded due diligence questions from governmental agencies.  *Id.* at 22, 24.

52.     During a July 22, 2020, site visit to Eastman Business Park, DFC stated that it wanted to enter a LOI with Kodak.  That day, Kodak and DFC scheduled a press release announcing the LOI and a public signing ceremony for July 28, 2020.  *Id.* at 25.

**G.      The Secret Understanding Is Effectuated Just Before Kodak Discloses the LOI**

53.     On the morning of July 27, 2020, Kodak advised journalists in Rochester about its initiative with DFC in a media advisory that failed to indicate an embargo time.  Reports from local media, many of which were quickly removed at Kodak's request, caused its stock price to jump almost 25%, to $2.62 per share, on volume of over seven times its thirty-day average.

54.     Also on July 27, 2020, pursuant to the Secret Understanding, the Board granted Continenza options to purchase 1.75 million shares of Kodak stock, with 28.57% of those options vesting immediately and the remainder vesting upon conversion of the Notes.  Of those options:

981,707 had a strike price of $3.03, 298,780 had a strike price of $4.53, 298,780 had a strike price of $6.03, and 170,733 had a strike price of $12.00.

55.     On Tuesday, July 28, 2020, Kodak stock opened at $9.63 per share after a *The Wall Street Journal* report that Kodak would receive a governmental loan to produce APIs.

56.     On July 28, 2020, DFC announced (the "DFC Announcement") the LOI to provide a Kodak subsidiary with a potential $765 million loan (the "DFC Loan") to support the launch of Kodak Pharmaceuticals, an initiative that would manufacture APIs for essential generic drugs.

57.     On July 28, 2020, at approximately 5:20 p.m., President Trump announced that the federal government was trying to finalize the DFC Loan.

58.     Also on July 28, 2020, during an interview, Navarro and DFC chief executive Adam Boehler stated that the federal government would help bolster Kodak's pharmaceutical subsidiary by buying API for a strategic stockpile.  Navarro and Boehler also stated that drug companies planned to sign advance purchase orders for Kodak's ingredients.

59.     On July 28, 2020, after the DFC Announcement was made public, an entity affiliated with Southeastern sold 4 million Kodak shares.

60.     On July 29, 2020, before the market opened, Continenza, asked on CNBC's Squawk Box whether the LOI was a "done deal[,]" responded that "we feel very comfortable that we can bank on it[,]" and that "[w]e feel very comfortable we're gonna get to the end game or we probably wouldn't be probably sitting here."

61.     On July 29, 2020, Kodak stock traded as high as $60 before closing at $33.20.

**H.     The Secret Understanding Is Disclosed and Karfunkel Makes a Spurious Gift**

62.     After markets closed on July 29, 2020, Continenza filed a Form 4 with the SEC disclosing the options he received on July 27, 2020.  *The New York Times* reported that "[w]ithin 48 hours … their value had ballooned, at least on paper, to about $50 million" and "[a] Kodak

spokeswoman declined to comment on the timing of the stock-options grants and emphasized that the value of the options could change before Mr. Continenza uses them to buy Kodak shares."

63.    Also on July 29, 2020, taking advantage of the spike in Kodak's stock price, and ignoring the Insider Trading Policy (Report at 33-34, 52 & n.421), Karfunkel made an insider sale in the form of a charitable donation (the "Donation") of 3,000,000 shares of Kodak stock to Congregation Chemdas Yisroel Inc.  It was reported that, based upon Internal Revenue Service guidance, the Donation, worth $116.3 million, was the single largest gift publicly made to a religious group based on a list maintained by the Chronicle of Philanthropy, and gave Karfunkel the ability to claim a tax deduction of $52.5-$180 million (or between $17.05 and $60 per share).

64.    On July 30, 2020, Continenza amended his July 29, 2020, Form 4 "to provide greater detail on the terms of the options."  The amended form explained that:

> Following the issuance of the [Notes], the [Board] desired to protect [Continenza] from the economic dilution attributable to the issuance of the Notes, which affected the value of the options granted upon his becoming Executive Chairman of the Company (the "Original Grant").  The options described in this Form 4 were out-of-the-money when granted and have the same exercise prices and term as the Original Grant.  The terms of this award described in this Form 4, including the exercise prices, were generally designed to put Mr. Continenza in the same economic position he would have been in had the Notes been repaid instead of converted into common stock.  ***The award described in this Form 4 was unable to be made until additional shares were authorized to be issued under the [Incentive Plan on] May 20, 2020***….  (Emphasis added).

65.    On August 3, 2020, Byrd learned of the Donation.  Report at 53.

66.    Also on August 3, 2020, Southeastern converted $95 million in Notes into 29,922,956 Kodak shares, causing more of Continenza's options to vest because Continenza's options vest in lockstep with conversion of the Notes, as explained above in ¶54.

**I.     Defendants' Actions Cause Kodak to Lose the DFC Loan, the Karfunkel Donation Is Reduced, and Kodak Is Further Damaged**

67.     On August 3, 2020, Senator Elizabeth Warren wrote to SEC Chairman Jay Clayton noting "several instances of unusual trading activity prior to the announcement of [the DFC Loan], raising questions about whether one or more individuals may have engaged in insider trading or in the unauthorized disclosure of material, nonpublic information…."  Senator Warren further wrote:

> The purchase of stock by Mr. Continenza … while the company was involved in secret negotiations with the government over a lucrative contract raises questions about whether these executives potentially made investment decisions based on material, non-public information derived from their positions.

> Additionally, the timing and scope of the trades in the days before the premature public release of information on the deal and the actual public announcement raise serious questions.  If investors or Kodak employees were trading based on the unauthorized disclosure or discussion of nonpublic information, then it would appear to be a clear violation of securities law…. [footnotes omitted]

68.     On August 4, 2020, *The Wall Street Journal* reported that the SEC was investigating the circumstances around Kodak's announcement of its receipt of the DFC Loan.

69.     On August 7, 2020, DFC tweeted that "[o]n July 28, we signed a Letter of Interest with Eastman Kodak.  Recent allegations of wrongdoing raise serious concerns.  We will not proceed any further unless these allegations are cleared."

70.     Navarro quickly replied to that tweet, tweeting: "VERY disappointed last week's great deal with Kodak tarnished by allegations.  Absolutely RIGHT move by DFC!  We must redouble efforts to bring our pharma manufacturing home!!  #BuyAmerican[.]"

71.     On August 11, 2020, Kodak disclosed its Q2 2020 financial results.  Because of regulatory and Congressional scrutiny, Kodak did not open a trading window that quarter.  Byrd's email advising that a trading window would not open stated that recipients "may not engage in any transaction involving Kodak securities (including a stock plan transaction such a stock option exercise, gift, … or any other transfer) without obtaining preclearance from me."  Report at 35.

72.     On August 13, 2020, the Securities Class Action was filed.

73.     On August 17, 2020, Navarro appeared on CNBC's Squawk Box and stated, in part, that OMTP loved the Kodak project but "[b]ased on what I'm seeing, what happened at Kodak was *probably the dumbest decisions made by executives in corporate history*[,]" "[y]ou can't fix 'stupid,'" and "[y]ou *can't even anticipate that degree of stupidity*."  (Emphasis added).

74.     On September 10, 2020, Southeastern filed an amended Form 13G indicating that it had sold substantially all the shares it received through the Notes conversion.

75.     A November 10, 2020, Form 10-Q filed by Kodak with the SEC states:

As referenced in the DFC's announcement, the signing of the letter of interest indicates Kodak's successful completion of the DFC's initial screening and will be followed by standard due diligence conducted by the DFC before financing is formally committed.…  Congressional investigations and an SEC investigation have been commenced which could affect the likelihood of the consummation of the DFC Loan.  The DFC has tweeted that it will not proceed any further with the potential DFC Loan unless the recent allegations raised in the context of the potential DFC Loan have been cleared and has reported that its inspector general is conducting an internal investigation with respect to the potential DFC Loan.  The potential DFC Loan has sparked intense media interest and coverage.  If the DFC Loan is not made or if the findings of the investigations are unfavorable, Kodak's reputation could be damaged and its existing business could be adversely affected.

76.     On January 12, 2021, Karfunkel filed a Form 4 representing that he had retroactively rescinded one million shares of the Donation.

77.     On March 16, 2021, Kodak filed a Form 10-K annual report, disclosing that its liquidity, capital resources, and negative cash flow "raise[d] substantial doubt about [its] ability to continue as a going concern."

78.     A May 17, 2021, Form 10-Q filed by Kodak with the SEC states:

…The application process for the DFC Loan was put on hold when investigations were commenced with respect to the circumstances surrounding the DFC Announcement.  While the letter of interest with the DFC has never been formally terminated and the Company has not received any communication from the DFC rejecting its application, given the time that has elapsed and the recent changes in administration at the federal government and the DFC, *the Company is operating*

*on the basis that the DFC Loan as envisioned at the time of the DFC Announcement will not proceed*. The Company remains interested in working with the DFC and other governmental agencies to leverage its assets and technology to on-shore manufacturing of pharmaceutical and other healthcare materials. As described under "Overview" above, the Company is also continuing to explore expanding further into the pharmaceutical space on a smaller scale than contemplated by the DFC Loan using other sources of capital…. (Emphasis added).

## V.   DERIVATIVE STANDING AND DEMAND REFUSAL ALLEGATIONS

79.    The Board's conduct since receipt of the Demand demonstrates that it never considered the Demand in good faith and that it, instead, constructively rejected the Demand for reasons unrelated to the merits of Kodak's claims and Kodak's best interests, which was not a valid exercise of business judgment.  Plaintiff thus has standing to assert claims and to seek recovery on behalf of Kodak.

80.    Plaintiff brings this action derivatively in the right and for the benefit of Kodak to redress injuries suffered, and to be suffered, by Kodak as a direct result of violations of federal securities laws, fiduciary duties, and Company policies.  Kodak is named as a nominal defendant solely in a derivative capacity.

81.    On August 24, 2020, Plaintiff sent the Demand, which states that Plaintiff is, and at all times relevant to the issues addressed in the Demand was, a Kodak shareholder.  The Demand asked the Board to assert the claims pled below to redress harms to Kodak.

82.    On August 26, 2020, the Demand was delivered.  *See* Exhibit B.

83.    On November 24, 2020, Plaintiff sent further correspondence to the Board (the "Follow-up Letter") stating that any response to the Demand was dilatory and recognizing that the Report seems to reject the premises of the Demand but fails to explicitly state whether the Demand was refused in whole or in part.  In an abundance of caution, Plaintiff requested that the Board "[p]lease let us know as soon as possible, *i.e.*, within one week, if our assumption that the Demand has been rejected is incorrect."  A copy of the Follow-up Letter is attached hereto as Exhibit C.

84.     True and correct copies of further correspondence between Plaintiff's counsel and counsel for Kodak is attached hereto as Exhibits D through F.  Responses were promised and not delivered.  Plaintiff has not received a substantive response to his Demand despite three follow-up attempts and more than one year having passed since his Demand was served.

85.     Plaintiff thus has standing to bring this suit.  *See* NJ Rev Stat § 14A:3-6.3 ("No shareholder may commence a derivative proceeding until: (1) a written demand has been made upon the corporation to take suitable action; and (2) 90 days have expired from the date the demand was made" or certain inapplicable exception occur).

86.     Alternatively, to the extent demand was refused by the Report, the Report is fundamentally flawed in several material respects, demonstrating wrongful refusal, including, *inter alia*, that:

a.      Akin Gump, the law firm that authored the Report, is conflicted because it represents Continenza and Bullwinkle, who are defendants in the Securities Class Action and potential targets of the relief sought by the Demand, as well as Kodak;

b.      The Report's recitation of the facts differs, materially, from the Novack Affirmation (*see, e.g.*, ¶¶42-45, *supra*), when stating that, "[a]ll of the witnesses interviewed in this investigation, including those directly involved in the loan application process, as well as those on the sidelines, reported that they believed that Kodak had a chance, but that it was not likely that the application would be successful" (Report at 18);

c.      The Report fails to explore or analyze whether Kodak insiders, at the time they transacted in Kodak stock, had access to material non-public information concerning DFC discussions.  By contrast, the Novack Affirmation explains how Project Tiger represented material

non-public information at the time of Continenza's purchase and, when combined with the Report, demonstrates that Continenza violated the Insider Trading Policy (*see* Novack Aff. ¶¶37-40);

      d.     The Special Committee's conclusion that Continenza's purchase of Kodak stock on June 23, 2020, took place before his conversation with a DFC employee, was made without interviewing that employee, and it is unclear what text messages to which the Report is referring (Report at 20 & n.124);

      e.     The Special Committee's conclusion that Continenza's purchase of Kodak stock on June 23, 2020, was made "after receiving pre-approval to do so from Kodak's General Counsel" (*id.* at 20 n.124) is flatly contradicted by ¶¶34-40 of the Novack Affirmation;

      f.     The Report fails to address whether Kodak was required to disclose the Secret Understanding in the 2020 Proxy pursuant to Item 10 of Schedule 14A, 17 C.F.R. § 240.14a-101, to the 2020 Proxy;

      g.     Karfunkel's testimony is unreliable, because he told Akin Gump that he did not recall participating in a July 27, 2020, telephonic Board meeting but Byrd's contemporaneous handwritten notes marked Karfunkel present for that meeting (Report at 52);

      h.     The Donation occurred when Kodak's insider trading window was closed, and the Donation was also prohibited by the Insider Trading Policy. *Id.* at 52. Rather than seeking or receiving pre-clearance "at least one day in advance of the proposed transaction[,]" Byrd did not learn about the Donation until August 3, 2020. *Id.* at 53;

      i.     The Report's "ability to fully investigate the *bona fide*s of the Donation or the charity that received it was limited because [Akin Gump] did not have access to the records of the charity and were unable to interview any of its officers or directors with the exception of

Karfunkel" and the Report did not address the potential tax implications of the Donation.  Report at 3 n.2; and,

   j. The Report's assumption that the Donation was a *bona fide* gift (*id.* at 60-61) is further irreconcilable with the Donation having been reduced by one million shares approximately six months after it was made.

  87. As a direct and proximate result of the Defendants' conduct, Kodak has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

   a. Squandering the DFC Loan, and jeopardizing Kodak's continued viability;

   b. Legal fees and potential penalties or settlements incurred in connection with, and any funds paid to settle or in connection with any judgment rendered in, the Securities Class Action, Congressional investigations, the SEC's investigation, and the NY AG's Inquiry;

   c. Costs incurred from compensation and benefits paid to the Defendants who have breached their duties to Kodak, including the reduction of funds received (or to be received) through the granting of underpriced options to Continenza, and;

   d. Damaging Kodak's corporate image and goodwill and, for at least the foreseeable future, while it has a going concern qualification from its auditors, subjecting Kodak to a "liar's discount," that will impair Kodak's ability to raise equity capital or debt on favorable terms because it has been implicated in illegal behavior and misleading the investing public.

## VI. COUNTS

### A. Count I: Against Continenza for Violating Section 14 of the Exchange Act

  88. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

  89. The Demand (at 3, 7) asserts that Kodak should assert claims related to the 2020 Proxy having violated the Exchange Act.

90.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

91.     Proposal 4 included a "New Plan Benefits" table required by Item 10 of Schedule 14A, 17 C.F.R. § 240.14a-101, which regulation governs proxy solicitation, requires that plan benefits table to "disclose the benefits or amounts that will be received by or allocated to" certain persons, including Continenza, "if such benefits or amounts are determinable[.]"   Despite identifying a grant of 200,000 stock options to a non-executive employee if Proposal 4 passed, the 2020 Proxy violated the Exchange Act by omitting the Secret Understanding pursuant to which the grants that would inure to Continenza were readily determinable but had not yet been precisely calculated.

92.     The misrepresentations and omissions in the 2020 Proxy were material to shareholders voting on 2020 Proxy Proposals 2 and 4.

93.     Kodak was damaged as a result of the material misrepresentations and omissions in the 2020 Proxy.

**B.     Count II: Against Defendants for Breaches of Fiduciary Duties**

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     The Demand (at 6-7) asserts that Kodak should sue Karfunkel and Continenza in connection with the conduct described in this Complaint.

96.     Defendants owe Kodak and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of Kodak's affairs and in the use and preservation of its property

and assets, and the highest obligations of fair dealing. Defendants were required to act in furtherance of the best interests of Kodak and its shareholders, so as to benefit the Company, and not in furtherance of their personal interest or benefit.

97.     In breach of their fiduciary duties, and in violation of Kodak's Executive Compensation Policy, which prohibited "manipulat[ing] the timing of the public release of material information or of any Equity Award with the intent of benefiting a grantee under an Equity Award" (Report at 47), Defendants willfully participated in and caused Kodak to expend corporate funds unnecessarily, rendering Defendants personally liable for breaching their fiduciary duties.

98.     Defendants' actions resulted in Kodak losing the DFC Loan.

99.     As a direct and proximate result of Defendants' conduct, Kodak has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability, loss of the DFC Loan, and a loss of goodwill in the capital markets. Defendants are liable to the Company for those damages and must disgorge the funds that they improperly received.

100.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**C.      Count III: Against Continenza and Karfunkel for Insider Trading**

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    The Demand (at 6-7) asserts that Kodak should assert breach of fiduciary duty claims against Karfunkel in connection with the Donation and Continenza in connection with his transactions. Those claims include Defendants' violations of the Insider Trading Policy.

103.    Defendants are fiduciaries of Kodak, and possessed Kodak's material, non-public information. Defendants used that information improperly to profit from transactions in Kodak stock that were motivated, in whole or in part, by the substance of the material, non-public information they possessed. Defendants acted with scienter.

104.    When Defendants transacted in Kodak stock, they knew that the investing public was unaware of the material, non-public information that they possessed.

105.    Defendants timed their stock transactions to take advantage of the investing public's ignorance of the concealed material facts and obtain a more favorable price for their transactions by not disclosing material, non-public information before transacting and thereby benefitted by misappropriating Kodak's non-public information.

106.    Plaintiff has no adequate remedy at law.

## VII.    PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Kodak, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Kodak and is an adequate representative of the Company;

B.    Against Defendants, and in favor of Kodak, for the damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties;

C.    Directing Kodak to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kodak and its stockholders from a repeat of the damaging events described herein;

D.    Directing Kodak to put forward Proposal 2 and Proposal 4 for a stockholder re-vote with full disclosure of the Secret Understanding;

E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of Kodak, has an effective remedy;

F.    Awarding Kodak restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

G.      Awarding Plaintiff the costs and disbursements of this Action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## VIII.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: September 2, 2021                    By:  /s/  Michael J. Klein
                                                     Jeffrey S. Abraham (motion for *pro hac
                                                     vice* admission forthcoming)
                                                     Michael J. Klein
                                                     **ABRAHAM, FRUCHTER & TWERSKY, LLP**
                                                     450 7th Avenue, 38th Floor
                                                     New York, New York 10123
                                                     Telephone:     (212) 279-5050
                                                     Email:          jabraham@aftlaw.com
                                                                       mklein@aftlaw.com